**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BIO-RAD LABORATORIES, INC.<br><br>       Plaintiff,<br><br>    v.<br><br>10X GENOMICS, INC.,<br><br>       Defendant,<br><br>    and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE<br><br>       Nominal Defendant. | C.A. No. _____<br><br>**DEMAND FOR JURY TRIAL** |

## **COMPLAINT**

Bio-Rad Laboratories, Inc. ("Bio-Rad") hereby alleges for its Complaint ("Complaint") against Defendant 10X Genomics, Inc. ("10X") and nominal Defendant President and Fellows of Harvard College ("Harvard University"), on personal knowledge as to their own actions and on information and belief as to the actions of others, as follows:

### **NATURE OF THE ACTION**

1.   This is an action for patent infringement arising under the United States Patent Act 35 U.S.C. §§1 *et seq.*, including 35 U.S.C. § 271.

2.   Bio-Rad brings this action to halt 10X's infringement of its rights under the Patent Laws of the United States 35 U.S.C. §1, *et. seq.*, which arise under U.S. Patent No. 8,871,444 ("the '444 patent"), which is attached hereto as Exhibit 1.

## THE PARTIES

3. Plaintiff Bio-Rad is a Delaware corporation having a principal place of business at 1000 Alfred Nobel Drive, Hercules, CA 94547.

4. 10X is a company organized and existing under the laws of Delaware, with its principal place of business at 7068 Koll Center Parkway, Suite 401, Pleasanton, CA, 94566.

5. Harvard University is a research university incorporated as a Massachusetts not-for-profit institution, with its principal place of business at 1563 Massachusetts Ave., Cambridge, Massachusetts 02138. Harvard University is a patent owner and licensor for the '444 patent. Harvard University is named as a nominal defendant in this action for purposes of subject matter jurisdiction only and pursuant to the United States Supreme Court's holding in *Independent Wireless Tel. Co. v. Radio Corp. of Am.*, 269, U.S. 459, 468 (1926), that "[i]f the owner of a patent, being within the jurisdiction, refuses or is unable to join an exclusive licensee as coplaintiff, the licensee may make him a party defendant by process, and he will be lined up by the court in the party character which he should assume." Bio-Rad requested that Harvard University join as a party in this action, but Harvard University has thus far not agreed to do so. Although Harvard University is named as a nominal defendant, Bio-Rad seeks relief realigning Harvard University as a plaintiff.

## JURISDICTION AND VENUE

6. This action for patent infringement arises under the patent laws of the United States, Title 35 of the United States Code.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8.      This Court has personal jurisdiction over defendant 10X. 10X has substantial contacts with the forum as a consequence of conducting business in Delaware, and has purposefully availed itself of the benefits and protections of Delaware state law by incorporating under Delaware law.

9.      This Court has personal jurisdiction over nominal defendant Harvard University. Harvard University has substantial contacts with the forum as a consequence of conducting business and activities in Delaware.

10.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and 1400(b) because Bio-Rad and 10X are both Delaware corporations and Delaware is a convenient forum for resolution of the parties' disputes set forth herein.

## BACKGROUND

11.     Bio-Rad is a leader in the field of life science research and clinical diagnostics, and today many of Bio-Rad's products and tools used in the biotechnology industry are recognized as the gold standard.

12.     A centerpiece of many of Bio-Rad's products is its Droplet Digital™ technology. This technology involves partitioning biological samples by placing them in individual microdroplets that are formed based on emulsion chemistry. Using this technology, researchers can create a large numbers of partitions, each one for carrying out a reaction, with a minimum amount of sample handling and a minimum amount of sample volume. A variety of different reactions may be carried out inside the droplets, including polymerase chain reaction ("PCR"), and various reactions to prepare samples for next generation sequencing ("NGS").

13.     Bio-Rad began offering its Droplet Digital™ PCR ("ddPCR™") Systems brands in 2011 following its $162 million acquisition of QuantaLife, Inc. ("QuantaLife") and its digital

droplet PCR technology. The work at QuantaLife, and subsequently at Bio-Rad, led to a large number of patents being granted throughout the world concerning droplet-based emulsion systems and methods.

14.     Bio-Rad's droplet digital technology was a breakthrough that greatly advanced the capabilities of PCR and NGS. Just one year after the launch of Bio-Rad's first generation product, the number of papers citing Bio-Rad's droplet digital method using PCR nearly quintupled. Indeed, more than 250 peer-reviewed papers have been published in the fields of cancer, liquid biopsy, virology, and other diseases that cited to BioRad's technology.

15.     Bio-Rad's ddSEQ™ Single-Cell Isolator uses Droplet Digital™ technology to encapsulate single cells and barcodes into subnanoliter droplets, where cell lysis and barcoding of cellular messenger RNA occur. Libraries are generated representing the messenger RNAs from single cells that can be sequenced for Single Cell Analysis.

16.     Bio-Rad has spent years and hundreds of millions of dollars researching, acquiring and developing its Droplet technology and portfolio that is the foundation for many droplet-based applications such as ddPCR™ and NGS and Single Cell Analysis.

17.     For instance, in addition to its $162 million acquisition of QuantaLife, Bio-Rad completed an $87 million acquisition of RainDance Technologies, Inc. ("RainDance"), and all of its intellectual property.

18.     As another example, Bio-Rad is the exclusive licensee of droplet intellectual property from world-renowned institutions, such as Harvard University and Lawrence Livermore National Laboratory. Likewise, by virtue of its acquisition of RainDance, Bio-Rad acquired an exclusive licensee to foundational droplet technology developed at the University of Chicago.

19. Starting in 2012, several Bio-Rad employees left to found 10X Technologies, Inc., which later became Defendant 10X. This company, like Bio-Rad, focused on developing systems and methods for generating droplet-based emulsions.

20. In 2015, 10X launched a droplet-based emulsion system called GemCode that used the claimed microchips and chemistry for forming droplets that can be used in, among other things, Next Generation Sequencing and Single Cell Analysis. Approximately one year later, 10X launched an updated version of its droplet-based emulsion system called Chromium. These platforms compete against Bio-Rad's Droplet Digital™ technology.

21. In February 2015, RainDance filed a lawsuit in this district accusing 10X's GemCode and Chromium platforms of infringing several patents developed at the University of Chicago. Following its acquisition of RainDance, Bio-Rad substituted itself as the lead Plaintiff in this litigation. In November 2018, Bio-Rad obtained a jury verdict of willful infringement against 10X Genomics, and in August 2019 Bio-Rad obtained a permanent injunction.

22. Following the jury verdict, 10X announced a new line of products, which it recently began selling under the tradename "Next GEM." The Next GEM platform consists of an instrument known as the Chromium Controller along with reagent kits for carrying out various genetic analyses, including at least 10X's Chromium Single Cell Gene Expression Solution, Chromium Single Cell Immune Profiling Solution, and Chromium Single Cell ATAC Solution. *See generally* Exs. 2-3.

23. The Next GEM platform is at the heart of a $362 million IPO that 10X will launch imminently. As 10X stated in its prospectus, "[w]e currently expect that, by the end of the third quarter of 2019, all Chromium instruments that we sell will operate exclusively with our Next

GEM solutions and that our Chromium products utilizing our Next GEM microfluidic chips will constitute substantially all of our Chromium sales by the end of 2020." Ex. 4 at 7.

24. 10X, however, infringes, literally or under the doctrine of equivalents, at least the '444 patent through its activities connected to the Next GEM platform.

## COUNT I

### (Infringement of U.S. Patent No. 8,871,444)

25. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 24 above as relevant to this count.

26. On October 28, 2014, the United States Patent and Trademark Office duly and legally issued the '444 patent, entitled "In vitro evolution in microfluidic systems." A copy of the '444 patent is attached as Exhibit 1.

27. Andrew David Griffiths, David A. Weitz, Darren R. Link, Keunho Link, and Jerome Bibette are the sole and true inventors of the '444 patent. By operation of law and as a result of written assignment agreements, United Kingdom Research and Innovation ("UKRI") and President and Fellows of Harvard College ("Harvard University") obtained the entire right, title and interest to and in the '444 patent.

28. Pursuant to license agreements Bio-Rad entered into with UKRI and Harvard University, Bio-Rad obtained an exclusive license to the '444 patent in the field of microfluidic systems, kits and chips.

29. On information and belief, 10X has infringed and continues to infringe at least claims 1-2, 4, and 8 of the '444 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using within the United States without authority the Next GEM products. As an example, attached as Exhibit 5 is a preliminary and exemplary claim chart

6

detailing 10X's infringement of multiple claims of the '444 patent. This chart is not intended to limit Plaintiff's right to modify this chart or any other claim chart or allege that other activities of 10X infringe the identified claims or any other claims of the '444 patent or any other patents. Exhibit 5 is hereby incorporated by reference in its entirety. Each claim element in Exhibit 5 that is mapped to 10X's Next GEM platform shall be considered an allegation within the meaning of the Federal Rules of Civil Procedure and therefore a response to each allegation is required.

30. 10X's infringement of the '444 patent has been knowing and willful. 10X's founders, senior-most executives, and senior scientists became aware of Bio-Rad's license with Harvard University at least in connection with 10X's November 2018 trial against Bio-Rad in this district, where 10X was found to willfully infringe intellectual property from the University of Chicago. Moreover, 10X has become deeply familiar with the full scope of the Harvard University droplet patent portfolio (including the '444 patent), at least because it has licensed certain patents from Harvard University, as confirmed by Dr. Ben Hindson, 10X's co-founder and Chief Scientific Officer, during 10X's November 2018 trial. In fact, Dr. Hindson confirmed that 10X was well aware of the work of at least one named inventor of the '444 patent, including Dr. Weitz.

31. Consistent with the foregoing, going back to at least April 4, 2014, 10X has filed Information Disclosure Statements with the United States Patent Office in which it has cited U.S. Patent Application No. 2006/0078888, which is a published version of the priority application that the '444 patent is a continuation of. *See* Exs. 10-13.

32. On information and belief, in view of 10X's (1) knowledge of Bio-Rad's license with Harvard University, (2) knowledge of the Harvard University droplet patents, and (3) prior willful infringement of intellectual property controlled by Bio-Rad, 10X has carefully monitored

7

and analyzed the Harvard University droplet patent portfolio and, through that work, become aware of the '444 patent and the fact that the Next GEM platform infringes the '444 patent. Despite being aware of these facts, 10Xs has nonetheless launched its Next GEM platform, even making it the centerpiece of a $362 million IPO.  As 10X stated in in its prospectus in support of its IPO, "[w]e currently expect that, by the end of the third quarter of 2019, all Chromium instruments that we sell will operate exclusively with our Next GEM solutions and that our Chromium products utilizing our Next GEM microfluidic chips will constitute substantially all of our Chromium sales by the end of 2020."  Ex. 4 at 7.

33. In addition, 10X has had knowledge of and notice of the '444 patent and its infringement since at least, and through, the filing and service of this Complaint and despite this knowledge continues to commit the aforementioned infringing acts.  For at least the reasons stated in this paragraph and in paragraphs 30-32 above, this infringement has been willful.

34. 10X actively, knowingly, and intentionally has induced, or has threatened to induce, infringement of at least claims 1-2, 4, and 8 of the '444 patent through a range of activities.  First, on information and belief, 10X has induced infringement by controlling the design and manufacture of, offering for sale, and selling the Next GEM platform and/or its individual components with the knowledge and specific intent that its customers will use the Next GEM platform to infringe the '444 patent, literally or under the doctrine of equivalents, by performing the claimed method for detecting a product of an enzymatic reaction.

35. Second, on information and belief, 10X has induced infringement by its customers through the dissemination of promotional and marketing materials relating to the Next GEM platform with the knowledge and specific intent that its customers will use the Next GEM platform to infringe the '444 patent, literally or under the doctrine of equivalents, by performing

the claimed method for detecting a product of an enzymatic reaction. For instance, 10X promotes the Next GEM platform on its website. As 10X states on the Technology portion of its website, its "proprietary Next GEM technology fuels our Chromium System with an innovative reagent delivery system, set of algorithms and turnkey software analysis tools that enable the discovery of previously inaccessible genetic information at massive rate and scale." Ex. 3 at 1.

36. Third, on information and belief, 10X has induced infringement by its customers through the creation of distribution channels for the Next GEM platform and/or its individual components in the United States with the knowledge and specific intent that its customers will use the Next GEM platform to infringe the '444 patent, literally or under the doctrine of equivalents, by performing the claimed method for detecting a product of an enzymatic reaction.

37. Fourth, on information and belief, 10X has induced infringement through the distribution of other instructional materials, product manuals, and technical materials with the knowledge and the specific intent to encourage and facilitate its customer's infringing (either literally or under the doctrine of equivalents) use of the Next GEM platform. *See, e.g.*, Exs. 2, 7-9. 10X is liable for its induced infringement of the '444 patent pursuant to 35 U.S.C. § 271 (b).

38. 10X has engaged in the above activities with knowledge of the '444 patent and with the specific intent to encourage and cause infringement by its customers, as shown by the allegations set forth in ¶¶ 30-37 above.

39. 10X has contributed to, or has threatened to contribute to, the infringement by its customers of the '444 patent by, without authority, selling and offering to sell within the United States materials and apparatuses for practicing the claimed invention of the '444 patent, including at least the Next GEM platform as a whole and/or the individual components of the Next GEM platform (including without limitation reagent kits). When, for example, the Next

GEM platform is used by 10X's customers for the various applications 10X offers, the claimed method for detecting the product of an enzymatic reaction is performed, thereby infringing, literally or under the doctrine of equivalents, at least claims 1-2, 4, and 8 of the '444 patent. The Next GEM platform and/or its individual components, supplied by 10X, constitute a material part of the claimed invention of the '444 patent.

40. On information and belief, 10X knows that the Next GEM platform and/or its individual components constitute a material part of the inventions of the '444 patent and that they are not a staple article or commodity of commerce suitable for substantial noninfringing use. As documented above and in Exhibit 5, the Next GEM platform consists of a specialized microfluidic device along with specialized reagents for conducting reactions in microfluidic droplets. *See supra* ¶ 22; Exs. 2, 7-9. As such, no part of the Next GEM platform is a staple article of commerce suitable for substantial non-infringing use. 10X knows that the Next GEM platform and its individual components are not staple articles or commodities of commerce suitable for substantial non-infringing use because the Next GEM platform and its individual components have no use apart from infringing the '444 patent. 10X is liable for its contributory infringement of the '444 patent pursuant to 35 U.S.C. § 271(c).

41. 10X's infringement of the '444 patent has injured Plaintiff in its business and property rights. 10X's infringement of the '444 patent has been and is deliberate and willful and constitutes egregious misconduct. Despite actual knowledge of the '444 patent and numerous related patents and applications since at least its trial against Bio-Rad in this district in November 2018, 10X continued to develop and launch its infringing products. As set forth in Exhibit 5, when customers use 10X's Next GEM platform, they practice every element of multiple claims of the '444 patent. In developing and launching its product, 10X has been willfully blind to this

ongoing infringement. Plaintiff is entitled to recover monetary damages for the injuries arising from 10X's willful infringement pursuant to 35 U.S.C. § 284 in an amount to be determined at trial. 10X's infringement of the '444 patent has caused irreparable harm to Plaintiff and will continue to cause such harm unless and until 10X's infringing activities are enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Bio-Rad prays for relief as follows:

A. Judgment that 10X has infringed one or more claims of the '444 patent;

B. An order permanently enjoining 10X from further infringement of the '444 patent or in the alternative an on-going royalty;

C. An award of damages pursuant to 35 U.S.C. § 284;

D. A determination that 10X's infringement of the '444 patent has been and is willful, and an award of enhanced damages, up to and including trebling of the damages awarded to Bio-Rad;

E. An award to Bio-Rad of its costs, pre- and post-judgment interest, and reasonable expenses to the fullest extent permitted by law;

F. A declaration that this case is exceptional pursuant to 35 U.S.C. § 285, and an award of attorneys' fees and costs; and

G. An award of such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Bio-Rad hereby demands a trial by jury on all issues so triable.

| | |
|---|---|
| Dated: September 11, 2019 | Respectfully submitted, |
| | FARNAN LLP |
| Of Counsel: | |
| | /s/ Brian E. Farnan |
| Edward R. Reines | Brian E. Farnan (Bar No. 4089) |
| Derek C. Walter | Michael J. Farnan (Bar No. 5165) |
| WEIL, GOTSHAL & MANGES LLP | 919 N. Market St., 12th Floor |
| 201 Redwood Shores Parkway | Wilmington, DE 19801 |
| Redwood Shores, CA 94065 | (302) 777-0300 |
| (650) 802-3000 | (302) 777-0301 (Fax) |
| | bfarnan@farnanlaw.com |
| | mfarnan@farnanlaw.com |
| | |
| | *Attorneys for Plaintiff Bio-Rad Laboratories, Inc.* |